
UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SEPTEMBER WALOKE,<br><br>Defendant. | 3:16-CR-30148-02-RAL<br><br><br>OPINION AND ORDER<br>DENYING MOTION FOR ACQUITTAL<br>OR NEW TRIAL |

A jury convicted Defendant September Waloke (September)[1] of concealing a person from arrest in violation of 18 U.S.C. § 1071. Doc. 131. The jury acquitted September's co-defendant, her husband Everett Condon (Everett). Docs. 131, 135. September now has filed a Motion for Acquittal or New Trial, Doc. 138, which the Government opposes, Doc. 142. For the reasons explained herein, this Court denies the Motion for Acquittal or New Trial filed by September.

I. Facts

September and Everett were indicted for allegedly harboring and concealing Tyson Curtis LeCompte, a/k/a Tyson Garreau (Tyson) on or about October 19 or 20, 2016, after having knowledge that Tyson was wanted on a federal arrest warrant. Doc. 1. September and Everett pleaded not guilty and had a jury trial that ran from September 12 through September 14, 2017. Many of the facts were uncontested, and the outcome of the trial hinged in large measure on a

---

[1] A number of witnesses and individuals mentioned in the testimony have the last names of Condon or Garreau, so this Court is using first names for several people including September.

1

credibility decision as to which, if either, of two convicted felons—Tyson and Braxtyn Garreau—were believable.

Tyson had been indicted in United States District Court for the District of South Dakota for distribution of the controlled substance methamphetamine. By October of 2016, Tyson had pleaded guilty to that offense, admitting guilt to having distributed less than five grams of methamphetamine. Trial Exhs. 7, 8. While Tyson was awaiting sentencing, Magistrate Judge Mark A. Moreno granted Tyson's motion for furlough to attend the funeral of his aunt Jeri Garreau. Exh. 9. Tyson and another federal inmate named Allen Garreau (Allen) were to be released from the custody of the Hughes County Jail at 8 a.m. on October 19, 2016, to third-party custodian Tracy Garreau for them to attend the funeral and for them to return by 6 p.m. that day to the Hughes County Jail. Exh. 9. Allen returned consistent with the order granting him a furlough, but Tyson did not.

During his trial testimony, Tyson explained that he left the Hughes County Jail with his third-party custodian and Allen. Tyson needed to change clothes for the funeral and had his on-again-off-again girlfriend Carlee Condon (Carlee), who is the daughter of September and Everett, bring him clothes that Tyson had left at the Cherry Creek home of September and Everett. Tyson met Carlee in Eagle Butte, changed clothes, then was with family at the funeral from about 11 a.m. until 1 p.m. on October 19, and attended the burial. Tyson decided to abscond while at the burial and left with his cousin Charlie Marshall (Charlie). Tyson then drank alcohol and used methamphetamine while a passenger in a car with a group that included Charlie and the key Government witness, Braxtyn Garreau (Braxtyn). When the car was traveling north of Eagle Butte, Tyson became nervous that he was being followed, so he jumped out of the car.

2

Being stranded north of Eagle Butte, Tyson used a phone, which he apparently had borrowed earlier from Rhonda Claymore, to call Carlee and ask for a ride.

At the time Tyson called Carlee, Carlee was at the hospital in Eagle Butte with her older sister Erica Condon (Erica). Erica had worked in Timber Lake during the day, felt ill, had driven to the hospital in Eagle Butte, and was in the process of finding out that she was pregnant. Carlee asked for Erica's keys, ostensibly so that Carlee could go out to Erica's car, smoke a cigarette, and listen to music. Carlee took Erica's car without permission, picked up Tyson, and drove with him to the Fischer ranch located between Eagle Butte and Cherry Creek. Erica became aware that Carlee took her car without permission, stranding Erica at the Eagle Buttle Hospital. Erica attempted repeatedly to contact Carlee, posted on Facebook and reported the car stolen. Braxtyn showed up later at the Fischer ranch, where Tyson, Carlee, and Braxtyn stayed until 1:30 or 2 a.m. (according to Braxtyn), or until about 3 a.m. (according to Tyson).

Representatives of the United States Marshals Service (USMS) were on the Cheyenne River Indian Reservation executing arrest warrants on October 19 when word reached them that Tyson had failed to return from his furlough and that Magistrate Judge Moreno had issued an oral arrest warrant for Tyson. After arranging for the transfer of certain other fugitives to another vehicle headed back to the Hughes County Jail, USMS supervisory deputy Steven Houghtaling and USMS deputy Trevor Lumadue on the evening of October 19, began investigating Tyson's whereabouts. They met with the third-party custodian Tracy Garreau and Tracy's mother, who suggested that Tyson may have fled with Carlee. They then spoke with Carlee's brother Tiger Condon who advised that Carlee likely was in Cherry Creek at September and Everett's home, described the home, and told the USMS deputies to look for a black Monte Carlo in front of the home. USMS deputies Houghtaling and Lumadue met up with USMS

3

deputy Jonathan Runner, who separately had interviewed Allen about Tyson and what happened during the furlough at the Hughes County Jail, and the three of them drove to September and Everett's home in Cherry Creek. Cherry Creek is an extremely isolated community on the southern edge of the Cheyenne River Indian Reservation. Cherry Creek is approximately 54 miles from Eagle Butte and approximately 88 miles from Pierre. Though a community of perhaps 500 people, winding and hilly gravel roads are the only routes to access Cherry Creek. The USMS deputies arrived in Cherry Creek perhaps around midnight.

After meeting and locating the home of September and Everett, the three USMS deputies took positions around the home, with Houghtaling knocking at one door and Lumadue knocking at a second door. There appeared to be a number of individuals inside and awake in the house, but no one initially responded to the USMS deputies. Ultimately, Everett talked with Houghtaling through a window, communicating that someone inside the house had called a security officer.

The Cheyenne River Sioux Tribe provides for the basic law enforcement needs to the community of Cherry Creek, but does so from Eagle Butte which is roughly an hour's drive away. Accordingly, there is a district deputy of the Cheyenne River Sioux Tribe Law Enforcement named Derrek Yellow Owl, who lives in Cherry Creek and responds to calls placed to dispatch in Eagle Butte that originate from Cherry Creek. Yellow Owl is not a police officer per se and is armed only with a flashlight. The remoteness of Cherry Creek is such that there is extremely spotty cell phone coverage, so the Cheyenne River Sioux Tribe Law Enforcement sends text messages to Yellow Owl, who while on duty, periodically drives by one of the two locations in Cherry Creek where there is cell phone reception, and thereby receives messages. Yellow Owl was on duty during the early morning hours of October 20 and received a message

that September had reported someone trying to break into her home. Yellow Owl responded and was surprised to encounter USMS deputies upon arriving at September and Everett's home.

After talking with USMS deputies, Yellow Owl made contact with Everett, convinced Everett that the USMS was not there for him, and had Everett come outside the home to talk. This communication led to Houghtaling and Lumadue being invited into the home to search for Tyson. The USMS did not have a search warrant and thus were not entitled to search the home under these circumstances without consent. Although there were young men in the home that were unfriendly to the USMS deputies, Everett was cordial and cooperative, did not seek to escalate the hostilities, and accompanied the USMS deputies as they searched the home. The home is a single level home with an open kitchen and living room, four bedrooms and a bathroom. The USMS deputies spent approximately 20 minutes searching the home. Tyson was not in the home.

After conducting the search, Houghtaling met outside the home with September and Everett. Houghtaling gave his standard speech warning against harboring a fugitive and about the duties of September and Everett if they encountered Tyson. This conversation may have lasted as long as 15 minutes and involved some repetition about September and Everett's obligation not to assist or harbor Tyson. During the conversation, Everett said that Tyson was not there and that they did not know where he was. September told Houghtaling that Carlee and Tyson had broken up, that Carlee was dating someone named Jason, and that there was no reason why Tyson would be at the home. The USMS deputies left Cherry Creek perhaps around 1:30 a.m. on October 20.

Sometime around or after USMS deputies left Cherry Creek, Tyson, Carlee, and Braxtyn chose to leave the Fischer ranch. Because Erica had reported her car stolen and had made that

clear through a Facebook posting, text messages, and phone messages, Braxtyn asked another person at the Fischer ranch, Arlyn Keckler, if she could borrow his car. Keckler agreed. However, Keckler's car only made it a few miles and ran out of gas approximately eight miles away from Cherry Creek. Braxtyn climbed a nearby hill to get cell phone service, and called for someone to come from Eagle Butte to pick them up. Meanwhile, Carlee got upset and started walking to Cherry Creek. Tyson chose to follow her.

According to Tyson, the two of them were picked up by another vehicle on their way to Cherry Creek, and arrived at September and Everett's home around 5 a.m. on October 20. Carlee—who did not testify, invoking the Fifth Amendment outside the hearing of the jury—went in through the door, while according to Tyson, he waited at the window to Carlee's bedroom and then entered the home through the window into Carlee's bedroom. Tyson testified that he had been drinking and using methamphetamine so he went to sleep and slept in that day. When he awoke, he and Carlee were the only ones in the home, so he watched television and went outside to smoke a cigarette, leaving his shoes in the mud room area near the door. Tyson anticipated getting picked up by Braxtyn later that day and being taken to Rapid City. Tyson testified that at 3 p.m. he went back to sleep in Carlee's bedroom with Carlee, awakened later upon hearing someone knocking, and then woke up Carlee.

Braxtyn's testimony largely paralleled Tyson's testimony to a point. Braxtyn acknowledged that she once told a defense investigator that she saw Tyson go through the window to enter September and Everett's home, although at trial she made clear that she did not make it to Cherry Creek with Tyson and Carlee. At trial, Braxtyn testified that she was drinking and using methamphetamine throughout the evening of October 19, that she was at the Fischer ranch with Tyson and Carlee, that she borrowed Keckler's car, that the car ran out of gas where

6

there was no cell phone service, and that she called to get a ride from Corey DeHorse from Eagle Butte. She waited for DeHorse and ended up back in Eagle Butte by herself, because Tyson went walking after Carlee toward Cherry Creek. Braxtyn testified that she called for Tyson on October 20 during the day, dialing the number that Tyson had called her from the previous day. Braxtyn testified that September answered[2] and said that Tyson was there sleeping in her home. Braxtyn testified that she informed September that she was going to come and maybe take Tyson to Rapid City. Braxtyn was driving toward Cherry Creek when she saw vehicles that she thought belonged to the USMS pass her.

On the afternoon of October 20, Cheyenne River Sioux Tribe Law Enforcement received a tip that Tyson was at September and Everett's home. Three officers from the Cheyenne River Sioux Tribe traveled to Cherry Creek and met at September and Everett's home. Sergeant Jeremy Reede knocked on the door of the home, and it took up to one minute for his knocks to be answered. September ultimately opened the door. Sergeant Reede explained why he was there and asked to search the home two separate times, but September said Tyson was not there and returned to the stove. Sergeant Reede was allowed into the home and asked a third time for permission to search. September asked Everett if he had seen Tyson, and Everett, who was sitting at the kitchen table with Evelyn "Miss Mary" Buck Elk Thunder (Miss Mary) said that he had not seen Tyson. The fourth time that Sergeant Reede asked to search, September consented. Sergeant Reede did not have a search warrant.

Sergeant Reede searched the bedrooms with open doors first and then Carlee came out of the one bedroom that had a closed door. Sergeant Reede went into that bedroom and saw a neatly made bed with a very apparent bulge, detected Tyson attempting to hide between the

---

[2] Trial testimony suggested that there is cell phone reception at one window of September and Everett's home.

mattress and the box springs, and told Tyson to come out. Sergeant Reede walked behind Tyson down the hallway to the open kitchen and living room area where September and Everett were with Miss Mary. From Sergeant Reede's perspective, no one seemed to be surprised at seeing Tyson. Sergeant Reede allowed Tyson to have a cigarette, handcuffed him, allowed people, including September, to hug him goodbye, noted that September was tearful, and took Tyson to be transported by another officer to jail.

Miss Mary testified that she is a neighbor and friend of September and Everett, noticed their car gone from the home on October 20, saw the car return around 4:30 or 5 p.m., and then went to the home to visit September and Everett. Miss Mary did not know that Tyson was in the home and believed September and Everett to be surprised when Tyson was found in the home. According to Tyson's testimony, he did not know that September and Everett were in the home and had not seen them that day. There was some reason to question Tyson's credibility, besides his felony conviction. Tyson was close to September and considered her as having helped to raise him. Tyson when interviewed by USMS deputy Lumadue made known that he was only going to say things that would help September.

Braxtyn arrived in Cherry Creek after Tyson was gone and saw Carlee crying. September said to Braxtyn that they had taken her brother, referring to Tyson, to prison. Braxtyn, though Tyson's cousin, was like a sister to Tyson. There were some reasons to question Braxtyn's credibility. Braxtyn, who has pleaded guilty to conspiracy to distribute the controlled substance methamphetamine, testified consistent with a cooperation agreement. She has not been sentenced but faces a guideline range of 70 to 87 months, and expressed strong motivation to try to minimize the amount of time she is separated from her two-year-old child.

Neither September nor Everett testified at trial. Carlee was called outside the presence of the jury and invoked her Fifth Amendment right not to incriminate herself.

The jury returned a verdict finding September guilty, but Everett not guilty, of the charged offense of concealing a person from arrest. Thereafter, September filed her Motion for Acquittal or New Trial, arguing that the evidence was insufficient to find that September actually harbored or concealed Tyson or intended to prevent Tyson's discovery or arrest. September also argues that she did nothing different than Everett who was acquitted and that the Government deprived September of her confrontation clause rights by threatening to indict Carlee close in time to the jury trial.

## II. Discussion

Rule 29 of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). After a jury verdict, a defendant may move for or renew a motion for judgment of acquittal. Fed. R. Crim. P. 26(c). When considering a motion for judgment of acquittal, the court views the evidence in the light most favorable to the government, resolves conflicts in the government's favor, and accepts all reasonable inferences that support the verdict. U.S. v. Santana, 524 F.3d 851, 853 (8th Cir. 2008); U.S. v. Frederick, 10-CR-30021-RAL, Doc. 297 at 26 (Feb. 9, 2011). "The jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." U.S. v. Moore, 108 F.3d 878, 881 (8th Cir. 1997); U.S. v. Hood, 51 F.3d 128, 129 (8th Cir. 1995) ("Jury verdicts are not lightly overturned."). This Court does not make credibility determinations when reviewing the evidence

under a motion for acquittal; such determinations are the province of the jury. United States. v. Stegmeier, 701 F.3d 574, 578 (8th Cir. 2012) (internal citation omitted).

The standard for granting a new trial is different from the standard for granting judgment of acquittal. Under Rule 33 of the Federal Rules of Criminal Procedure, this Court "may vacate any judgment and grant a new trial if the interests of justice so requires." When evaluating a motion for a new trial on the basis of insufficient evidence, "the district court is not required to view the evidence in the light most favorable to the verdict; instead, [it] may weigh the evidence and judge witness credibility for itself." United States v. Clayton, 787 F.3d 929, 935 (8th Cir. 2015) (citing United States v. Samuels, 543 F.3d 1013, 1019 (8th Cir. 2008)). However, a "jury's verdict must be allowed to stand unless the evidence weighs heavily enough against the verdict [such] that a miscarriage of justice may have occurred." Id. (alterations in original) (internal quotations omitted) (citing United States v. Johnson, 474 F.3d 1044, 1051 (8th Cir. 2007)). The power of the court to grant a new trial should be invoked only in an exceptional case where the evidence preponderates heavily against the verdict. U.S. v. Starr, 533 F.3d 985, 999 (8th Cir. 2008). "As a general rule, the decision whether to grant or deny a motion for a new trial lies within the discretion of the district court." U.S. v. McMahan, 744 F.2d 647, 652 (8th Cir. 1984). Such authority, however, "should be exercised sparingly and with caution." U.S. v. Cole, 537 F.3d 923, 926 (8th Cir. 2008).

The elements of the crime of concealing a person from arrest as alleged in the indictment are: 1) a federal warrant had been issued for the fugitive's arrest; 2) the defendant had knowledge that such a warrant had been issued; 3) the defendant actually harbored or concealed the fugitive; and 4) the defendant intended to prevent the fugitive's discovery or arrest. 18 U.S.C. § 1071; U.S. v. Hayes, 518 F.3d 989, 993 (8th Cir. 2008). September initially argues that

the evidence is insufficient to support a conviction on either the third or fourth elements of this offense of conviction. September was advised by the USMS of the existence of an arrest warrant for Tyson and such a warrant actually existed, so the first and second elements of the crime are not at issue.

As for the third element of harboring or concealment of a fugitive, there is no evidence that September (or Everett for that matter) harbored or concealed Tyson on October 19. Indeed, the USMS ultimately was allowed to search September and Everett's home shortly after midnight of October 20, concluded that Tyson was not there, and informed September and Everett that a federal arrest warrant had issued and that they could not assist Tyson. The jury evidently believed that September harbored or concealed Tyson later on October 20 based on Braxtyn's testimony. According to Braxtyn, she called the phone that Tyson had used,[3] September answered her phone call and told Braxtyn that Tyson was in her home asleep; Braxtyn then told September that Braxtyn was coming to get Tyson to maybe take him to Rapid City. September did not contact the USMS or the Cheyenne River Sioux Tribe Law Enforcement about Tyson. Later when Cheyenne River Sioux Tribe Law Enforcement arrived, September was slow to answer the door and did not consent to a search of the home until Sergeant Reede made a fourth request to her to do so. When Sergeant Reede brought Tyson out of the bedroom and down the hall, September did not appear to be surprised, and instead hugged Tyson and became tearful before he left. Taking this evidence together, and apparently believing Braxtyn, the jury had evidence to conclude that September actually harbored or concealed Tyson.

---

[3] Indeed, September admits that the evidence of Braxtyn's call is enough to preclude a favorable ruling on her Rule 29 motion with regard to the third element. Doc. 139 at 5.

11

The fourth element requires an intent to prevent the fugitive's discovery or arrest. If the jury believed Braxtyn's testimony which it must have done, then September received information that Braxtyn was coming to pick up Tyson to further Tyson's attempt to evade arrest. Thus, letting Tyson sleep at her home until Braxtyn arrived was in furtherance of preventing Tyson's discovery or arrest. September, as noted above, also delayed in opening the door for Sergeant Reede and to consenting to the search, which the jury could have presumed to be designed to give Tyson additional time to hide or flee. Although credibility issues might cause one to question whether Braxtyn's testimony was enough to dispel reasonable doubt, that ultimately is the jury's decision and not for this Court. Whether under the Rule 29 standard for judgment of acquittal or the somewhat less strict standard under Rule 33 for new trial, there is a view of the evidence that would allow a reasonable jury, if it were to believe Braxtyn's testimony, to find September guilty beyond a reasonable doubt. Even under the Rule 33 standard where the Court may "weigh the evidence and judge witness credibility for itself," Clayton, 787 F.3d at 935, this is not the type of exceptional case where the court should invoke its power to grant a new trial. See Starr, 533 F.3d at 999.

September argues that the evidence was insufficient to prove she had engaged in a physical act and had the requisite intent to prevent Tyson's discovery or arrest, and thus the conflicting verdict constitutes a miscarriage of justice. Doc. 139 at 9–10. September cites to a plethora of cases from the Eighth Circuit and beyond in an attempt to establish that none of her conduct could amount to a physical act required for a conviction under 18 U.S.C. § 1071. Doc. 139 at 6–9. But the Eighth Circuit has clearly established that "providing the fugitive a place to stay . . . satisfies the requirement for physical assistance." Stegmeier, 701 F.3d at 579 (internal citation omitted). As detailed above, there is sufficient evidence for a reasonable jury, if it

believed Braxtyn, to find September gave Tyson a place to stay, thus fulfilling the physical act requirement.

September next argues that she did nothing different than Everett, impliedly arguing that the jury was not reasonable or was inconsistent in its verdict. However, the actions of Everett and September were sufficiently different that a jury could have concluded that September was concealing Tyson and Everett was not or at least there was reasonable doubt as to what Everett did. First, when USMS supervisory deputy Houghtaling spoke with September and Everett outside of their residence, Everett simply said that Tyson was not there and he did not know where Tyson was. September, however, said that Carlee had broken up with Tyson, Carlee was with a new boy named Jason, and there was no reason for Tyson to be in their home. September's statements to the USMS deputies are not a crime of concealing Tyson, but demonstrate a different mindset from Everett and possibly an intent to mislead or deceive. During the trial Tyson testified that September was like a mother to him and, when refusing to talk to USMS deputy Lumadue, explained that he wasn't going to say anything that would hurt September. Tyson said nothing like that about Everett. Of course, and importantly, Braxtyn did not testify to any phone conversation with Everett, but rather to a phone conversation with September where September told her that Tyson was in the home asleep, and Braxtyn responded that she was coming to get Tyson to further his escape. There was no evidence that Everett was aware of any phone conversation between Braxtyn and September. Finally, when Sergeant Reede arrived at the residence, he spoke to September to request to search the residence, and encountered a delay from September. Sergeant Reede's only testimony about what Everett said or did was that Everett remained at the table, and that when September asked Everett whether Tyson was in the house, Everett said "not that I know of" or words to that effect. There was no

testimony about Everett becoming emotional during Tyson's arrest and removal from the home. Thus, there was enough of a different case as to Everett to justify his acquittal separately from September's conviction.

Finally, September argues that she ought to get a new trial—perhaps after an indictment, guilty plea or jury trial of Carlee occurs—so that Carlee can testify in any retrial. According to September, the Government only shortly before the trial advised that Carlee was being investigated for concealing a person from arrest, and the Government's investigation prompted Carlee to exercise her Fifth Amendment right, rather than to testify favorably for September. However, because Carlee invoked her Fifth Amendment right, did not testify about what occurred on October 19 and 20 at any time under oath, and was not subject to cross-examination, the assertion that Carlee's testimony would have been favorable to September is speculation at this point. Moreover, September did not seek a continuance prior to the trial upon learning that Carlee was under investigation or seek a mistrial or other relief during the trial upon learning that Carlee might or would invoke her Fifth Amendment right. Carlee's invocation of her Fifth Amendment right and the Government's investigation into whether Carlee ought also to be charged do not justify a judgment of acquittal or new trial.

### III. Conclusion

For the reasons explained in this Opinion and Order, it is hereby

ORDERED that September's Motion for Acquittal or New Trial, Doc. 138, is denied.

DATED this 20th day of October, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE